Elijah M. Watkins (ISB No. 8977)
Aaron R. Bell (ISB No. 10918)
Dakota S. Lee (ISB No. 13032)
DORSEY & WHITNEY LLP
101 S. Capitol Blvd., Ste. 1100
Boise, ID 83702
Phone: (208) 617-2550
Fax: (208) 567-4992
Watkins.Elijah@dorsey.com
Bell.Aaron@dorsey.com
Lee.Dakota@dorsey.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| AUSTIN JAMES OSBORNE, an individual;<br><br>Plaintiff,<br><br>-vs-<br><br>BARRY MINKOW, an individual,<br><br>Defendant. | Case No. 1:25-cv-00647-BLW<br><br>**MEMORANDUM IN SUPPORT OF RENEWED EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Austin James Osborne ("Osborne"), by and through his attorneys of record, Dorsey & Whitney LLP, submits this memorandum in support of his Renewed Emergency Motion for Preliminary Injunction (the "Motion"). For the reasons set forth below, and in the declarations filed contemporaneously herewith, the Court should grant the Motion.

### INTRODUCTION

Osborne submits a new request for a preliminary injunction under Rule 65(a) based on continued, new, and escalating publications by Defendant Barry Minkow ("Minkow") made in

connection with "settlement" offers that smack of a scheme to extort Osborne into paying Minkow through current investors of Cedar Creek to end Minkow's campaign of defamation.

On March 2, 2026, Minkow requested a call with Osborne's counsel to discuss a purported settlement. Rather than discuss terms relating directly to the claim against Minkow, Minkow demanded that Osborne pay two Cedar Creek investors and a third, unknown party, $250,000, which he claims they had invested, in exchange for a retraction of his statements. The persons Minkow identified had invested, collectively, far less than the $250,000 Minkow was demanding.

Days later, in subsequent communications, Minkow increased his demands to $850,000, and referenced investments by other third parties into companies completely unrelated to Osborne. When asked by Osborne's counsel to substantiate his shifting positions, Minkow provided confidential documents to Osborne's counsel that could only have come from investors subject to confidentiality provisions contained throughout the investor materials. When asked if Minkow had any form of contractual relationship with the investors and third parties such that he could extract money from Osborne on their behalf, Minkow responded that Osborne was a bully.

Having failed in his attempt to get money ostensibly for people he did not represent, on March 14, 2026, Minkow published a new article called "An Inconvenient Truth: How AJ Osborne and Cedar Creek Capital Use Mob-Like Tactics to Cover Up Material Misrepresentation and Fraud"— (the "Mob Article"). The Mob Article is rife with verifiably false facts and allegations about Osborne and his businesses. These false allegations include misstating purchase prices of assets held by Osborne's businesses, incorrect asset-level loan-to-value ratios, wrong investor reporting, and made-up marketing practices all to accuse Osborne and his businesses of malintent. The Mob Article was accompanied by at least six additional videos across Minkow's social media platforms that repeat Minkow's false statements and *per se* defamation of Osborne.

Minkow's new media posts build on his prior history of social media posts and articles alleging Osborne is committing fraud and improperly managing his business assets. These assertions are demonstrably false. Investor confidence has been shaken, and an increased volume of concerns are being voiced, commitments are hesitating, and fundraising efforts are significantly depressed from normal volumes. Minkow's false factual assertions amount to defamation *per se* and wrongful interference with Osborne's economic expectations. Minkow's revelation that he has obtained confidential company records from certain investors, and his public dissemination of these materials violates the confidentiality provisions contained throughout the investor materials as well as the Defend Trade Secrets Act. 18 U.S.C § 1832. Minkow's explicit threats and actions in releasing false information about Osborne also violate of 18 U.S.C. §§ 873 (blackmail), 875(d) (extortion)—ironically, actual mob-like tactics.

Osborne's injuries cannot be remedied by damages alone. The Court should grant the requested injunctive relief.

## STATEMENT OF FACTS

### I.  MINKOW'S HISTORICAL PATTERN AND PRACTICE OF DEFAMATION

This Motion adopts and incorporates the facts set forth in Osborne's Memorandum in Support of Motion for *Ex Parte* Temporary Restraining Order and Preliminary Injunction, Dkts. 2-1, 2-2, as if fully stated herein, and provides here only a summary for context as follows:

1.  Osborne is the principal of several Idaho-based companies, including Cedar Creek, a self-storage investment entity formed in 2020 that has completed over $400 million in transactions with more than 600 investors. Osborne's personal reputation is directly tied to ongoing capital fundraising for these businesses. In October 2025, investors alerted Osborne to a LinkedIn article by Barry Minkow, followed by two "Fraud Minute" videos, falsely accusing Osborne and Cedar Creek of undisclosed, portfolio-wide cross-collateralized debt, extreme loan-to-value

("LTV") ratios up to 214%, and deception that Minkow claimed was criminal, stating that "When you drive long enough on the road called extend and Pretend, there's only one exit. Prison." These publications presented sensational claims as facts to the investing public and positioned ordinary use of debt and financing as concealment and criminality. Minkow's posts were widely disseminated. By the time the case was filed, the two videos alone garnered thousands of views on Instagram and more than ten thousand views each on TikTok, amplified by Minkow's social-media followings—approximately 3,000 on LinkedIn, 36,100 on Instagram, and 69,500 on TikTok. Dkt 2-1, ¶¶ 2-11.

2.      Despite Minkow having absolutely no affiliation with Osborne or Cedar Creek, he claimed that Cedar Creek increased its advertising in response to Minkow's posts, and he doubled down on claims that investor communications masked undisclosed debt. In response, investors voiced concern and paused commitments during an active, time-sensitive raise. Approximately $1.5 million in prospective commitments were withdrawn and deal timelines were jeopardized as the posts continued to circulate and accumulate impressions. Osborne and Cedar Creek were compelled to divert time and resources to address investor questions about leverage, cross-collateralization, and marketing claims, even as Minkow's content invited current and prospective investors to view routine financing choices as proof of fraud. Dkt 2-1, ¶¶ 12-15.

3.      Taken together, the October 2025 article and videos established a narrative designed to alarm investors by recasting standard real-estate financing as deception, disparaging Osborne's professional integrity and painting him in a criminal light. Minkow's false statements cause skepticism within the skittish investor community. Osborne initiated this lawsuit as a result of Minkow's actions. Dkt 2-1, ¶¶ 11-15; Dkt. 1.

4.      Minkow is a conman. A felon who has been convicted three different times for similar schemes, a Ponzi scheme, embezzlement from a church he pastored, and theft from elderly members of that church. In a case much like this, Minkow released a false report accusing the Lennar Corporation ("Lennar") of accounting irregularities and fraud. He shorted Lennar's stock prior to issuing his false report, thereby receiving a windfall. Minkow pled guilty to conspiring to manipulate the stock price and was sentenced to five years in prison and was ordered to pay $583.5 million in restitution. Dkt. 2-1, ¶¶ 16-25.

## II.     MINKOW'S RENEWED AND RECENT EFFORTS TO DEFAME OSBORNE AND CEDAR CREEK SINCE THE LAWSUIT WAS FILED

### A.      *The Hustle*

1.      Similar to his Lennar scheme, and following the filing of the Complaint, Minkow has employed a defame-to-extort hustle against Osborne.

2.      On March 2, 2026, Minkow requested a call with Osborne's counsel to discuss settlement. During the call, rather than addressing his false publications, Minkow demanded that Osborne repay three alleged investors—some of whom he claimed were elderly cancer patients—their investments of approximately $250,000. Watkins Decl. ¶ 4, Ex. A.

3.      Only two of the investors mentioned by Minkow are actual investors of Cedar Creek, and their investments were much lower than Minkow claimed. Declaration of Austin James Osborne in Support of Renewed Emergency Motion for Preliminary Injunction at ¶ 32 (March 31, 2026) ("Osborne Decl.").

4.      Minkow offered to stop defaming Osborne and retract his false publications in exchange for payment to the investors. Watkins Decl. ¶ 4, Exs. A–D.

5.    During subsequent emails Minkow increased his demand to $850,000. Minkow based the increase on companies entirely unrelated to Osborne and their purported financials. *Id*. at ¶ 5; Ex. B.

6.    Minkow offered to provide documentation to back up his claims. *Id*. at ¶ 6, Exs. A, C.

7.    Once produced, not only was it clear that the documents did not prove what Minkow said they proved, but that Minkow had obtained the documents from investors in contravention of confidentiality provisions contained throughout the investor materials. When asked whether Minkow had some financial agreement with the purported investors, Minkow refused to answer and called Osborne a bully. *Id*. at ¶ 8, Ex. E.

**B.    *The False Statements***

8.    Unable to convince Osborne to pay money in exchange for not defaming him, Minkow has now published more false statements about Osborne and his business.

9.    On March 14, 2026, Minkow published a new article making false allegations against Osborne titled "An Inconvenient Truth: How AJ Osborne and Cedar Creek Capital Use Mob-Like Tactics to Cover Up Material Misrepresentation and Fraud." In the Mob Article Minkow asserts that Cedar Creek Fund I ("Fund 1") falsely represented the Elm property "purchase price" in investor materials and accuses Osborne and Cedar Creek of fraud, publishing the accusation to a wide online audience. Osborne Decl. ¶ 7, Ex. A.

10.    The Mob Article alleges Cedar Creek concealed portfolio-wide cross-collateralized or undisclosed debt and claims that a substantial portion of Fund 1's assets are "underwater," with undisclosed LTV percentages exceeding 99% to 175% LTV. Osborne Decl. Ex. A.

11.    Minkow claims the Denver property is leveraged at ~99.48% LTV with negligible equity, presenting this as evidence of mismanagement and deception. *Id.*

12. Minkow also contends Cedar Creek deceptively advertised "80% ROI" and 16–18% returns during asset sales, implying guaranteed, misleading performance claims to attract investors. *Id.*

13. Minkow asserts investor updates hid debt and reprises a theme that Osborne is lying and borrowing his way to a criminal outcome ending in a "ticket to prison." *Id.*

14. In the Mob Article, Minkow brags that he has received at least six different cease and desist letters from national law firms as a result of his comments about various companies. *Id*.

15. After posting the Mob Article, Minkow proceeded to post at least six additional videos to a several social media platforms making false allegations about how Osborne and Cedar Creek were actively misrepresenting LTV, purchase prices, and other financial details. Minkow realleges the Mob Article content and falsely claims Osborne is in violation of various laws, defrauding investors, using funds for personal use, and refusing to abide by the Fund 1 operating agreement. *Id.* at ¶¶ 8-11. Exs. B-E, K-L.[1] In his video posted on March 26, 2026, Minkow claims to have hired experts to analyze Cedar Creek's properties, unmistakenly positioning his statement not as mere opinion, but as fact. He does this despite lacking access to all the confidential financial data needed to backup his so-called expert analysis.

16. Minkow encourages investors to demand bank statements under operating agreement § 10.1, claiming that Cedar Creek is misrepresenting where investor funds are directed. *Id.* Ex. A (Mob Article).

---

[1] Minkow's social media video allegations against Osborne and Cedar Creek are provided to the Court on a USB drive accompanying the Osborne Declaration.

C.    ***The Truth***

17.    Fund 1 purchased the Elm property ██████████████████ ████████████████████████████████. The $5,108,424 Elm property figure cited by Minkow ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████ *Id.* at ¶¶ 12-18, Ex. F.

18.    Fund 1 maintained approximately ████████████████ LTV. There are no undisclosed portfolio-wide cross-collateralized loans tying up one-third of assets. Investor reports accurately disclose and reflect the fund's financing terms. *Id.* at ¶ 16.

19.    The Denver property's valuation reflects an approximately ████████ purchase price with around ██████████████ (around ███ LTV). The property was purchased and later refinanced. Funds received were, in accordance with the Fund 1 operating agreement, ████████████. *Id.* at ¶ 19; Exs. G-H.

20.    Investor disclosure materials offered by AJ Osborne and Cedar Creek pertain to separate projects and clearly present pro forma projections with appropriate disclaimers. No ***guaranteed*** "80% ROI" or 16–18% returns were marketed to Fund 1 investors. The required subscription agreements clearly disclose that the investment is "high risk" and that no returns are guaranteed. *Id.* at ¶¶ 20-21; Ex. J.

21.    Investor disclosures, paperwork, and updates did not conceal debt but instead accurately described ████████████████████████. Specifically, the private placement memorandum ("PPM") to investors stated, ██████████████

██████████████████████████████

████████████████████████████████████████████████████████ *Id.* at ¶ 20; Ex. I.

22.     Minkow's article and videos conflate accounting allocations with purchase prices and omits the context for the portfolio's overall financing structure. *Id.* at ¶¶ 7-11; Exs. A-E, K-L.

23.     ████████████████████████████████████████████████████████

████████████████████████████. Financial statements and investor reporting were provided upon request to members. Minkow is not a past or present investor in any Cedar Creek funds or entities and is not entitled to the confidential documents or financial records that investors are entitled to, subject to the confidentiality provisions of their subscription agreements and investor materials. *Id.* at ¶¶ 18, 23, 32.

24.     Osborne and Cedar Creek are dealing with continued concern from current investors, as well as difficulty obtaining outside investors as required by its business model as a result of Minkow's past and most recent publications of false statements. *Id.* at ¶¶ 26-30.

25.     Furthermore, Minkow fails to consider the market downturn and compression that has occurred since 2022. Interest rates have significantly increased, causing operating expenses to increase as well as debt costs to increase. Self-storage rents have also decreased as a result of increased market pressure, higher interest rates, and other factors. *Id.* at ¶ 19.

## ARGUMENT

### I.    LEGAL STANDARD.

Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65. Under Rule 65(a), a preliminary injunction can be issued only on notice to the adverse party. Fed. R. Civ. P. 65(a)(1).  The purpose of a preliminary injunction is to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits. *See Textile Unlimited, Inc. v. A. Bmhand & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Whether a preliminary injunction

should be issued is committed to the sound discretion of the district court. *Jimenez v. Barber*, 252 F.2d 550, 554 (9th Cir. 1958).

"The standards for both a temporary restraining order and a preliminary injunction are the same." *Alliance For Wild Rockies v. Pierson*, 550 F. Supp. 3d 894, 898 (D. Idaho 2021). To obtain such relief, Plaintiffs must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in their favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Under the Ninth Circuit's "sliding scale" approach, the elements "are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017). For example, "[t]he requirement of the likelihood of irreparable harm increases or decreases in inverse correlation to the probability of success on the merits, with these factors representing two points on a sliding scale." *De Shazo v. Bieter*, No. 1:21-CV-00427-BLW, 2021 WL 5701488, at *8 (D. Idaho Dec. 1, 2021) (citing *United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)).

## II.     OSBORNE IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

Plaintiff is likely to succeed on the causes of action upon which he seeks immediate injunctive relief—defamation/defamation *per se*, and intentional interference with a prospective economic advantage.

### A.     Defamation and Defamation *Per Se*

The Idaho Supreme Court explained the standard for defamation and defamation *per se* in *Irish v. Hall*, stating that defamation requires "(1) communicated information concerning the plaintiff to others; (2) that the information was defamatory; and (3) that the plaintiff was damaged because of the communication." 163 Idaho 603, 607, 416 P.3d 975, 979 (2018) (quoting *Clark v.*

*The Spokesman-Review*, 144 Idaho 427, 430, 163 P.3d 216, 219 (2007)). A defamatory statement is one "that tends to harm a person's reputation [usually] by subjecting the person to public contempt, disgrace, or ridicule, or by adversely affecting the person's business." *Elliott v. Murdock*, 161 Idaho 281, 287, 385 P.3d 459, 465 (2016) (quoting Defamatory, Black's Law Dictionary 506 (10th ed. 2014)).:

Similarly, defamation *per se* "involves: (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with business, trade, profession, or office; or (4) serious sexual misconduct." *Vig v. Gerdes*, 2020 Ida. App. Unpub. LEXIS 17, at *8 (Idaho Ct. App. Jan. 24, 2020)

At trial, Osborne is likely to prove each element of defamation under Idaho law—publication of defamatory statements, falsity, and resulting damages—based on Minkow's continuing campaign of false factual assertions. In his latest article, "An Inconvenient Truth: How AJ Osborne and Cedar Creek Capital Use Mob-Like Tactics to Cover Up Material Misrepresentation and Fraud," Minkow falsely claims that Fund 1 misstated the Elm property "purchase price," concealed portfolio-wide cross-collateralized or undisclosed debt, and operated the Denver asset at 99.48% LTV with only $80,000 in equity. Osborne Decl. ¶¶ 7-11, 16-17 Exs. A-E, K-L. He further characterizes Cedar Creek's marketing as deceptively touting 80% ROI and guaranteeing 16–18% returns and suggests criminal exposure of Osborne's conduct. *Id.* at ¶¶ 21-24. All of these statements are materially and verifiably false.

Both the Elm properties and Denver properties were accurately represented to investors. *Id.* at ¶ 18. Moreover, the Minkow accusations stem from a lack of understanding of the refinancing and debt loads of the properties. For example, he accuses Osborne of overleveraging the Denver Property at 99.48% when in reality the first loan was paid off in favor of new refinancing where

the proceeds returned to the operations of the property, to the reserves, and to the fund itself. *Id.* at ¶¶ 18-20 Exs. G, H.

Portfolio leverage is under ███ LTV, the Elm Property "price" figure allegedly disclosed to investors was not the purchase price at all, ████████████████████████ ████████████████, and the Denver Property figures Minkow cites are incorrect and omit the context that this was an ordinary refinance. See generally *Id.* Minkow alleges the Denver Property is underwater at 175% LTV. The reality is that a loan was used to purchase the property and in 2025, Osborne refinanced the property and ***paid off the previous loan***. *Id.* The property currently maintains an LTV of ███, not 175%. *Id.* Marketing materials identified separate projects and made pro forma representations with more than adequate disclaimers. *Id.* at Exs. I, J.

The Mob Article and new videos escalated from the earlier false allegations. Minkow misrepresents and falsely accuses Osborne of lying to obtain money, failing to disclose debt to investors, and criminal conduct within Osborne's business operations—all of which were widely disseminated to a large online audience. *Id.* at ¶¶ 7-11; Dkt. 2-2 at ¶ 8-10. Minkow is not, and never has been, a Cedar Creek investor and lacks access to internal records that would support his accusations. *Id.* at ¶¶ 18, 32. Nonetheless, he has continued to publish and even threaten further "disclosures" if challenged, underscoring his increasing and reckless disregard for the truth. *See* Dkt. 2-2.

These statements are not only defamatory; they are defamatory *per se* because they allege criminal conduct in numerous instances and directly attack both Osborne's and Cedar Creek's professional integrity and fitness to conduct business—classic *per se* categories that do not require proof of special damages. Osborne can also establish damages such as investor concern, reputational harm, slowed investor commitments, and withdrawals of over $1.5 million, which

continues to rise due to the ongoing defamation by Minkow. *Id.* at ¶¶ 8, 24, 31; Dkt. 2-2 at ¶¶ 14-15. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ *Id.* at ¶¶ 28-30. Given the competitive, time-sensitive nature of self-storage acquisitions and capital markets, these losses are not readily compensable by monetary damages alone and continue to accrue with each iteration of Minkow's claims. Osborne will prevail on the merits of his defamation and defamation *per se* claims.

### B.    Intentional Interference with a Prospective Economic Advantage

To prevail on a claim for intentional interference with a prospective economic advantage, a plaintiff must establish:

> (1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 893, 243 P.3d 1069, 1081 (2010). "To establish that the intentional interference resulting in injury was wrongful, [the plaintiff must prove] either: '(1) the defendant had an improper objective or purpose to harm the plaintiff; or (2) the defendant used a wrongful means to cause injury to the prospective business relationship.'" *Id.* (quoting *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 286, 824 P.2d 841, 861 (1991)). "[A]n enforceable contract need not be shown to exist, just a valid economic expectancy." *Id.*

Osborne and Cedar Creek operate a capital-raising platform with more than 600 investors and ongoing, time-sensitive fundraising to acquire income-producing self-storage assets—creating a business model that existing investors will remain and prospective investors will commit capital to current and future offerings. Osborne Decl. at ¶ 2; Dkt. 2-2 at ¶¶ 2-4. Minkow's publications

are intentionally directed at investors and the investing public. He leverages sizable social-media followings (approx. 3,000 on LinkedIn; 36,100 on Instagram; 69,500 on TikTok) and high-engagement posts to reach current and prospective investors. He explicitly encourages investor scrutiny and action (including calls to demand bank records), demonstrating awareness of Osborne's investor relationships and ongoing raise. Osborne Decl. at ¶¶ 7-11; Exs. A-E, K-L. After the initial posts and videos, Osborne received a flood of investor inquiries and withdrawals—approximately $1.5 million in commitments—directly tied to Minkow's posts; investors have shown renewed hesitation as Minkow escalated with his latest Mob Article, magnifying the disruption to the current fundraises and jeopardizing acquisitions tied to funding timelines. *Id.* at ¶¶ 28-30; Dkt. 2-2 at ¶¶ 14-15.

In his most recent posts, Minkow has urged followers to divest and not invest further with Osborne/Cedar Creek, and he continues to post even after his participation in this case, evidencing a purposeful campaign to disrupt investor relationships. *Id.* at Ex. A. His actions continue to cause damage to Osborne and Cedar Creek. Simply put, Minkow is employing wrongful means—defaming Osborne and disclosing confidential records wrongfully obtained from investors—for the improper purpose of profiting from select investors he demands be repaid.

His newest article disseminates verifiably false factual assertions based on cherry picking and a false interpretation of documents obtained and publicized in violation of confidentiality provisions contained throughout the investor materials. The portfolio is leveraged at approximately ███, industry standard for self-storage, yet Minkow spreads false statements alleging assets are severely overleveraged at 99% to 175%. *Id.* at ¶¶ 7-11; Exa. A-E, K-L; *Cf Id.* at ¶¶ 12-21; Exs. F-J. Minkow is intentionally disregarding facts, and peddling as "true" information he has no way of verifying.

Minkow also obtained confidential PPM materials, the operating agreement, and financial disclosures from investors. *Id.* at ¶¶ 18, 32. He then used these confidential documents to defame Osborne by publicly posting misconstrued details, such as the accounting fund basis of the Elm Property, and falsely claiming that Osborne lied to investors regarding the purchase price. *Id.* at ¶¶ 7-11; Exs. A-E, K-L. In reality, the investors placed money in a fund, which was then used with previously disclosed financing methods to obtain properties. *Id.* at ¶¶ 12-15, 20-22.

The direct and foreseeable result of Minkow's defamation has been lost and deferred capital (~$2 million withdrawn to date), chilled participation in a live raise, and the risk of missing competitive acquisition windows. *Id.* at ¶¶ 4-5, 28-30. These harms have already materialized and will compound if the campaign persists. Osborne is likely to prevail on his claim for intentional interference with a prospective economic advantage.

## III.    OSBORNE WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION DOES NOT ISSUE.

Minkow's continued dissemination of new, verifiably false statements will intensify the financial harm already suffered by Osborne. Following his initial publications, Osborne experienced investor concern and withdrawals directly impairing a time-sensitive raise and deal pipeline. Minkow has now escalated with fresh accusations that Osborne and Cedar Creek misstated property purchase prices, concealed portfolio-wide cross-collateralization and undisclosed debt, and ran the Denver Property and/or other assets at unacceptable loan to debt valuations—claims the record shows are false. Minkow also renews calls for criminal charges against Osborne.

In the Mob Article, Minkow brags that at least six different national law firms have sent in cease-and-desist letters, and yet he has not stopped. Without a preliminary injunction, Osborne will continue to be defamed and economically impaired by Minkow's continued actions. Monetary

damages alone will not make Osborne whole for lost investor confidence, diverted or withdrawn commitments, and missed acquisition windows in a competitive self-storage market. Courts recognize that reputational injury leading to lost customers and goodwill constitutes irreparable harm, and that such losses are not readily compensable at law. *See, e.g., San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1237–38 (9th Cir. 1997) (concluding that no adequate legal remedy existed for harm to hospital's reputation caused by misleading signs that would deter patients from seeking treatment at the hospital); *API Ams., Inc. v. Miller*, 380 F. Supp. 3d 1141, 1152-53 (D. Kan. 2019) ("loss of customers, loss of goodwill, loss of competitive advantage, and the like can support a finding of irreparable harm").

Without a preliminary injunction tailored to the false factual claims, Minkow will continue to amplify these allegations, and the resulting irreparable harm will only compound. The Court should enjoin.

## IV.    THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF.

The balance of equities favor Osborne. Osborne is the one who suffers ongoing harms absent injunctive relief. Investors have already pulled roughly $2 million, and prospective investors are hesitating in a time-sensitive fund raise. Osborne Decl. ¶¶ 4, 28-30. Minkow's newest publications compound the damage by injecting fresh falsehoods and claims of criminal misconduct into the market; asserting that Fund 1 misreported the Elm "purchase price," concealed cross-collateralized/undisclosed debt, and operated the Denver Property at ~99.48% LTV with ~$80,000 equity while simultaneously reviving earlier claims that Fund 1 was overleveraged and that Osborne's actions amount to criminal fraud. *Id.* at ¶¶ 7-11, Exs. A-E, K-L. In his video dated March 26, 2026, Minkow claims his analysis is backed up by accounting experts. *Id.* at Ex. L. But the financial data necessary to make such an analysis—facility revenue and expenses—is confidential and unavailable to Minkow. Bolstering his claims with alleged expert support, while

lacking the data needed to reach such a conclusion, takes Minkow's statements out of the realm of mere opinion. These statements, blasted to a large online audience and receiving numerous impressions, coupled with calls for investors to demand information, materially impair investor confidence and fundraising in real time.

By contrast, any "harm" to Minkow from a preliminary injunction is nonexistent or self-inflicted. The requested relief is narrowly tailored to restrain only demonstrably false factual assertions (not opinions or truthful speech). Courts discount hardship where it flows from the enjoined party's own wrongful conduct and where the injunction does no more than require compliance with the law. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a [party] might suffer if an injunction were imposed may be discounted by the fact that [that party] brought that injury upon itself"); *Dish Network L.L.C. v. Ramirez*, No. 15-CV-04712- BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (balance of hardships tips in favor of plaintiff seeking injunction when it would "do no more than require Defendant to comply with federal and state ... laws" (citation omitted)).

Minkow's self-generated harm carries little weight. Despite service of the lawsuit and negotiations with Osborne's counsel, Minkow persists in posting new, demonstrably false statements and broadcasting them widely online. Where one party's continued misconduct drives the harm, the equities tilt decisively toward the victim. Any injury to Minkow from injunctive relief flows from his own conduct. The balance favors Osborne.

## V.    THE PUBLIC INTEREST FACTOR SUPPORTS GRANTING INJUNCTIVE RELIEF.

Here, Osborne seeks only limited injunctive relief to enjoin Minkow from: (1) publishing, republishing, or maintaining publication of the false factual information about Osborne—including, without limitation, (a) that Osborne or Cedar Creek misstated the Fund 1 loan to value

percentages or purchase prices (b) that Osborne or Cedar Creek concealed portfolio-wide cross-collateralized or undisclosed debt and that that the portfolio was underwater (e.g., ~175% LTV), (c) that the Denver asset is ~99.48% LTV with ~$80,000 equity, (d) that Osborne or Cedar Creek deceptively advertised 80% ROI and 16–18% guaranteed returns, and (e) that Osborne's conduct is criminal when tied to those false factual assertions; (2) republishing substantially identical factual assertions to current or prospective investors via social media or other online platforms; and (3) requiring removal of existing posts containing the above-identified false statements. The requested relief is narrow in scope, only seeks to enjoin Minkow's conduct, and has no impact on the rights of non-parties to this case. Because the injunction only impacts Minkow, the public interest factor is neutral.

But even if the public's interest is implicated, it favors Osborne. The public has an interest in quelling harassment, protecting businesses from wrongful interference and false claims, and the extortion of entities and individuals. 18 U.S.C. § 873 (blackmail); 18 USCS § 875(d) (threats via interstate communications to harm property of another, reputation, or accusations of crimes); Idaho Code § 18-7906 (stalking in the second degree); Idaho Code §§ 18-2403(2)(e)(4), (5), and (9) (theft by extortion); Idaho Code § 18-4809 (threats to publish libel - extortion); Nev. Rev. Stat. Ann. § 200.575 (stalking); Nev. Rev. Stat. Ann. § 205.320 (theft by extortion); Nev. Rev. Stat. Ann. § 200.560 (threats to publish libel).[2]

In particular, Minkow is attempting to extort Osborne and Cedar Creek to repay certain investors. He first sought $250,000, then later $850,000 on "behalf" of allegedly defrauded investors. Minkow is not an attorney and has no authority to represent any supposed investors nor

---

[2] Minkow's conduct is opposite the public's interest of both Idaho and Nevada, where Minkow resides.

has Minkow ever been an investor himself in Fund 1, Cedar Creek, or with Osborne. Osborne Decl. ¶¶ 18, 32. Minkow's actions show an attempt to profit off his defamatory statements, whether directly or through indirect agreements with Osborne's investors.

The Defendant Trade Secrets Act also protects Osborne and Cedar Creek from misappropriation of their trade secrets. 18 U.S.C. § 1836; 18 U.S.C. § 1839 ( "the term 'trade secret' means all forms and types of financial, business, . . . [or] economic . . . information, including . . .methods, techniques, processes, [or] procedures . . ."); *In re Elec. Arts, Inc.*, 298 F. App'x at 569 (holding that a licensing agreement, which contained "pricing terms, royalty rates, and guaranteed minimum payment terms," constituted trade secrets); *See also Clark v. Bunker,* 453 F.2d 1006, 1009 (9th Cir 1972) (adopting the Restatement definition and holding that "a detailed plan for the creation, promotion, financing, and sale of contracts" constitutes a trade secret). The structure, financials, and operations of Osborne's self-storage investments qualify as trade secrets and Minkow, as a non-investor, is not entitled to the confidential materials related to the investment properties. Minkow wrongfully obtained the materials, combined them with sparse public records, and now is broadcasting the details to the public while simultaneously extorting Osborne and Cedar Creek for money. All clear violations of federal and state law.

The Court should conclude that public interest would not be harmed, or would, in fact, be served by issuance of the requested preliminary injunction.

## VI.     **NO BOND IS NEEDED.**

Because the terms of the injunction do not result in any potential monetary harm to Minkow, and only prevent continued defamation and tortious interference, no bond is needed. *See Jorgensen v. Cassiday*, 320 F. 3d 906, 919 (9th Cir. 2003) ("Rule 65(c) invests the district court with discretion as to the amount of security required, if any" and, therefore, the "district court may

dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."). The court should not require a bond.

## CONCLUSION

For the foregoing reasons, this Court should grant Osborne's Motion.

DATED:  April 1, 2026                    DORSEY & WHITNEY, LLP


By: */s/ Elijah M. Watkins*
    Elijah M. Watkins
    Aaron R. Bell
    Dakota S. Lee

    *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of April 2026, I served a true and correct copy of the within and foregoing with the Clerk of the Court using CM/ECF system and via first class mail, postage prepaid addressed as follows:

Barry Minkow
2924 Whispering Wind Drive
Las Vegas, NV 89117

/s/ Elijah M. Watkins
Elijah M. Watkins